UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-6681-VALLE

UNITED STATES OF AMERICA,

v.

MASON JOEL COURSON,

Defendant.
_____/

FILED BY ____AT____ D.C.

Dec 23, 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FTL

## DETENTION ORDER

THIS MATTER came before the Court upon the Government's motion to detain the Defendant, Mason Joel Courson, prior to trial and until the conclusion thereof. Having received evidence and heard arguments of counsel, and having considered the statutory factors in 18 U.S.C. §3142(g), the Court hereby GRANTS the Government's motion and hereby orders Defendant Mason Joel Courson, detained prior to trial, for the reasons stated on the record at the hearing and as further discussed below in accordance with the provisions of 18 U.S.C. § 3142(i).

A.   INTRODUCTION

The Defendant is charged by Indictment, along with eight other individuals, with a host of offenses stemming from his participation in the events at the United States Capitol on January 6, 2021. Specifically, the Defendant is charged with: Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of Title 18, United States Code Sections 111(a)(1) and (b) and 2 (Count 10); Assaulting, Resisting, or Impeding Certain Officers, in violation of Title 18, United States Code, Section 111(a)(1) (Count 11); Civil Disorder, in violation of Title 18, United States Code, Section 231(a)(3) (Counts 7 and 14); Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of Title 18,

United States Code, Section 1752(a)(2) and (b)(1)(A) (Count 18); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with Deadly or Dangerous Weapon, in violation of Title 18, United States Code, Section 1752(a)(2) and (b)(1)(A) (Count 19); Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of Title 18, United States Code, Section 1752(a)(4) and (b)(1)(A) (Count 20); and Act of Physical Violence in the Capitol Grounds or Buildings, in violation of Title 40, United States Code, Section 5104(e)(2)(F) (Count 24). The United States seeks detention on the basis of danger to the community.[1] On December 22, 2021, I held a hearing to determine whether any condition or combination of conditions of release will reasonably assure the safety of any person and the community. 18 U.S.C. § 3142(f). The Government must establish by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any individual or the safety of the community. 18 U.S.C. § 3142(f)(2). In determining whether the Government has met its burden by the requisite standard of proof, this Court must take into account the factors enumerated in 18 U.S.C. § 3142(g).

B.   FINDINGS OF FACT

The evidence adduced at the pretrial detention hearing consisted of the information contained in the Pretrial Services Report, the testimony of FBI Special Agent Michelle McDaniel, a composite exhibit of still images taken from various video recordings (GX 1), a "No File" notice

---

[1] As a preliminary matter, the Government correctly argues that the Defendant is eligible for pretrial detention, under 18 U.S.C. § 3142(f)(1)(A), because he is charged with at least one "crime of violence" – specifically, Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of Title 18, United States Code Sections 111(a)(1) and (b) and 2. *See United States v. Sabol*, No. 21-35-1 (EGS), 2021 WL 1405945, *5-7 (D.D.C. Apr. 14, 2021) (finding that a violation of § 111(a)(1) and (b) is a "crime of violence" under the definition in 18 U.S.C. § 3156(a)(4) and relevant case law). The Defendant is also charged with multiple offenses that "involve[] the possession or use of . . . a dangerous weapon[.]" *See* 18 U.S.C. § 3142(f)(1)(E).

from Florida's Circuit Court of the Fifteenth Judicial Circuit (DX 1), and two letters filed in support of the Defendant (DE 6-1, 6-2). I have considered all of this evidence in making my findings.

1. Government's Evidence

On January 6, 2021, a joint session of the U.S. Congress convened to certify the Electoral College vote count and the 2020 Presidential Election. According to a post-*Miranda* statement he later gave to the FBI, the Defendant had left Florida with a friend on January 4, 2021, to attend the "Stop the Steal" rally held by then-President Donald Trump in Washington, D.C. on January 6, 2021. The Defendant posted a picture on social media from the rally, indicating "I'm here to #stop the steal." GX 1 at 22. That day, the Defendant wore a grey Oakley jacket, a red Trump "beanie," sunglasses, black gloves, and a "Thin Blue Line USA" "gator" face and neck covering, while carrying a black or grey backpack.

Following the rally, the Defendant, and a mob of others, descended upon the U.S. Capitol's lower west terrace. There, they encountered officers from the Metropolitan Police Department (MPD), including officers B.M., A.W., and C.M., who had responded to assist the U.S. Capitol Police in quelling the riot occurring at the Capitol. The MPD officers guarded an archway tunnel access point where rioters, including the Defendant, were trying to enter the Capitol. By the Defendant's own admission post-*Miranda*, the scene was like a "war zone." The Defendant admitted that he and others were trying to enter the Capitol despite the police attempting to stop them. He described people trying to "battering ram" their way through the police, while yelling "heave ho."

The series of still-shots in GX 1 show some of the Defendant's actions in and among the riotous crowd at the lower west terrace. While, as defense counsel argued, the still-shots cannot

3

demonstrate the full range of the Defendant's actions and their context without the continuous videos from which they are taken, the still-shots nevertheless clearly demonstrate certain actions. The photographs at pages 2 and 3 of GX 1 show the Defendant[2] approaching and then reaching the archway gate guarded by the MPD. Around 3:16 p.m., the Defendant was among the rioters trying to force their way through the archway against the MPD officers. GX 1 at 4-7. By approximately 3:19 p.m., however, the body camera video of an officer shows the Defendant outside the archway, suggesting that he reversed course. *Id*. at 8. Approximately one minute later, another video shows the Defendant crouching down to the ground and standing back up with a police baton, which he then brandished aloft over his head. *Id*. at 9-10.

At approximately 4:27 p.m. – more than an hour later – the Defendant was still at the lower west terrace, with the baton in hand and headed towards the archway again. *Id.* at 11-12. Over the ensuing 90 seconds, officers B.M., A.W., and C.M. were brutally assaulted by the mob. A.W. was knocked to the ground and dragged through the crowd, where he was stomped on, mased, and struck with poles. Rioters ripped off A.W.'s helmet, took his gas mask, and stole his MPD-issued cell phone. B.M. was dragged over A.W. into the crowd, where he was repeatedly struck by a flag pole, police baton, and crutch. C.M. was assaulted while trying to reach B.M. and assist him. Ultimately, A.W. suffered multiple lacerations to his head, requiring multiple staples to stop the bleeding. B.M. suffered abrasions to his nose and cheek, as well as bruising to his left shoulder.

Shortly after co-defendants Whitton, Barnhart, and Sabol dragged down officer B.M. (*Id*. at 13), the Defendant approached with the baton he had obtained an hour earlier. *Id*. at 14. The

---

[2] The Defendant would later identify himself in one of the photographs during his post-Miranda interview, and a search of his home found the articles of clothing he is wearing in the photographs.

4

Defendant struck B.M. with the baton while B.M. was prone on the stairs near a railing. *Id*. at 15.[3] The Defendant then climbed over the railing, ascended the stairs, and, with other rioters, dragged A.W. down the stairs. *Id*. at 16-18. The image on page 20 of GX 1, from A.W.'s body camera, shows the Defendant and another individual standing over A.W. as A.W. struggled to get away, while page 19 shows the Defendant (from behind) hovering around A.W. while A.W. was being assaulted. The image on page 19 shows the Defendant still brandishing the baton. *Id*. Finally, the Defendant returned to B.M. and shoved B.M.'s head down as B.M. tried to get up. *Id*. at 21.

On December 14, 2021, approximately 10 FBI agents (in addition to a SWAT team), executed a search warrant on the Defendant's residence in Tamarac, Florida. With the Defendant's cooperation, the searching agents found the "Thin Blue Line" face shield, grey Oakley jacket, and red Trump beanie that the Defendant is seen wearing in the still-shots from January 6, 2021. They also recovered the baton that the Defendant was seen wielding. Additionally, the agents found two firearms (which defense counsel represented have since been secured and removed from the residence).

The Defendant spoke to a subset of the agents in an (unrecorded) post-*Miranda* statement in his kitchen. As mentioned above, the Defendant identified himself in one of the photographs in GX 1 and admitted to going to the Capitol grounds after the Stop the Steal rally. He described the

---

[3] As described below, during his post-*Miranda* statement, the Defendant admitted to exchanging blows with officers, taking the baton, and striking an officer with the baton. However, when shown the photos on page 15 of GX 1, the Defendant claimed to be helping to protect the officer from other protestors. This explanation is not consistent with the images on page 15. Those images show the Defendant crouched over B.M., holding the baton with a two-handed grip, with his arms and the baton extended down towards B.M.'s back. From these images, in combination with the Defendant's other post-*Miranda* statements stating that he felt striking the officers was "justified," I find that there is clear and convincing evidence that the Defendant did, indeed, strike B.M. with the baton.

scene at the Capitol Grounds as being like a "war zone" and that he felt like he was in a "battle." Specifically, he described the air being thick with pepper spray and the police using pepper spray, gas, rubber bullets, and batons to try to clear the area. He admitted to trying to enter the Capitol even though police were trying to keep people out of the building and further admitted that he ultimately entered the Capitol. As stated above, he described people in the crowd acting like a "battering ram" to get through the police officers. He also admitted that he had exchanged blows with officers, had taken the baton, and had hit an officer with the baton. Despite his "Thin Blue Line" face covering (seemingly showing support for law enforcement), he stated that he felt these officers were not "thin blue line" but rather were "traitors." He also claimed that hitting the officer was justified because of the chaos of the situation.

There is no evidence that the has or had any connection to any militia, anti-government, or other radical groups either before or after January 6. Nor is there any evidence of him making social media postings or other communications about violence against the government. There is no evidence that he planned on engaging in violence when he left Florida on January 4; for example, there is no evidence that he arrived in Washington, D.C. with any weapons (including the baton), pepper spray, helmet, gas mask, body armor, or other tactical gear. Nor is there any evidence that he has committed any other crimes since January 6, including during the few days of surveillance by the FBI prior to the execution of the search warrant. There is also no evidence that he attempted to obstruct the investigation or otherwise obstruct justice. He was also cooperative during the search, assisting the agents in finding the clothing he wore, identifying the friend he had traveled with, and speaking to the agents in his kitchen after waiving his *Miranda* rights.

2. <u>Pretrial Services Report</u>

According to the Pretrial Services Report, the Defendant is 26 years old and a lifetime resident of south Florida. His parents and two adult siblings all live in south Florida, and he shares custody of a two-year-old child with the child's mother (who lives in Tallahassee). He is self-employed in a business (which defense counsel proffered sells audio equipment), from which he earns approximately $1,500-$2,000 per month, and trades digital currency. He consumes marijuana daily and alcohol weekly, but he has no other history of substance abuse and no history of mental health treatment.

The Defendant's criminal history includes a series of incidents between 2013 and 2018. In 2013 (at the age of 17), the Defendant was charged with disorderly conduct and resisting an officer, although the charges were dropped after the Defendant completed a pretrial diversion program. Approximately a year-and-a-half later, in September 2015, the Defendant was charged with (and ultimately adjudicated guilty of) battery and resisting arrest without violence, for which he received one year of probation in March 2016.[4] Less than five months after being placed on probation, he violated that probation and committed the offense of grand theft (3rd degree). During his probation, he also committed offenses of peddling without a license or permit and loitering or

---

[4] The Government proffered facts from the arrest affidavit of this incident, which described the Defendant as having punched the owner of a bar while intoxicated and then pushing, kicking, and fleeing from multiple law enforcement officers. However, while the Defendant was initially charged with multiple counts of battery on a law enforcement officer, assault and battery on a law enforcement officer, and resisting an officer with violence, two weeks later the state prosecutor chose not to file these charges. DX 1. Instead, the Defendant was only convicted of one count of battery and one count of resisting arrest without violence (with other counts of battery, marijuana possession, and disorderly intoxication being nolle prosed). Therefore, I do not rely on the specific facts proffered from the arrest affidavit. Defense counsel represented that the incident involved the Defendant being intoxicated and having an altercation with the owner of the establishment.

prowling. For the grand theft offense, he was again placed on probation in December 2017, which apparently terminated about six weeks later when he paid restitution. Approximately two months after termination of this term of probation, he was arrested for (and ultimately pled guilty to) driving under the influence in Pennsylvania.

C.  STATEMENT OF REASONS FOR DETENTION

Title 18, United States Code, Sections 3142(g) requires the Court to consider the nature and circumstances of the offense, the weight of the evidence against the Defendant, the history and characteristics of the Defendant, and the nature and seriousness of any danger to a person or to the community caused by the Defendant's release. After considering those factors in detail as described below, and based upon the above findings of fact, the Court specifically finds by clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of the community. 18 U.S.C. § 3142(e).

1.  The nature and circumstances of the offense charged.

The nature and circumstances of the offense charged weigh heavily in favor of detention. For starters, the clear and convincing evidence indicates that the Defendant took part in what can only be described as an armed insurrection against American democracy. That the riot involved violent attacks on law enforcement officers and caused serious concern for the safety of lawmakers and others in the Capitol alone makes the offenses incredibly serious. But it is inescapable that the purpose of the riot was to disrupt "the solemn process of certifying a presidential election." *United States v. Cua*, No. 21-107 (RDM), 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021). The rioters sought to overturn the results of a democratic election with which they were unhappy – not by politics or by law, but by force. I cannot conceive of anything evincing a greater disrespect for the rule of law.

8

However, I must – and do – consider this Defendant's individual conduct and the specific offenses with which he is charged. For "despite the serious and chilling nature of the events that took place [on January 6], the D.C. Circuit has made clear that detention is not appropriate in all cases involving Capitol Riot defendants." *Sabol*, 2021 WL 1405945 at *10 (citing *United States v. Munchel*, No. 21-3010, 2021 WL 1149196, at *4 (D.C. Cir. Mar. 26, 2021)). Specifically, I consider the six "guideposts" that the District Court for the District of Columbia has utilized to assess the comparative culpability of defendants in relation to other rioters from that day: "(1) whether the defendant has been charged with felony or misdemeanor offenses; (2) the extent of the defendant's prior planning, 'for example, by obtaining weapons or tactical gear'; (3) whether the defendant used or carried a dangerous weapon; (4) evidence of coordination with other protestors before, during, or after the riot; (5) whether the defendant played a leadership role in the events of January 6, 2021; and (6) the defendant's 'words and movements during the riot'—e.g., whether the defendant 'remained only on the grounds surrounding the Capitol' or stormed into the Capitol interior, or whether the defendant 'injured, attempted to injure, or threatened to injure others.'" *Id*. (citing *United States v. Chrestman*, 525 F. Supp.3d 14 (D.D.C. 2021)).

Half of these factors weigh in favor of finding the Defendant among those whose offenses were more serious while half weigh against. Most of the Defendant's alleged offenses are felonies, rather than misdemeanors. The most serious of these, Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of Title 18, United States Code Sections 111(a)(1) and (b) and 2 (Count 10), carries a maximum penalty of 20 years in prison, and the Government estimates that the Defendant would face a guidelines range of 97-121 months in prison if convicted without acceptance of responsibility (and 70-87 months with

9

acceptance of responsibility). During the alleged offenses, the Defendant also used a dangerous weapon – the police baton that he obtained and brandished during the riot. The last factor also weighs in favor of finding the Defendant's conduct among the more serious group of offenders. During the riot, he did not merely remain on the Capitol grounds or enter after others had cleared the way. Rather, he was among those seeking to "battering ram" their way through officers protecting the entrance and actually entered the Capitol. Even more significantly, he attempted to injure another person – specifically officer B.M. by striking him with the baton and officer A.W. by assisting in dragging him down the stairs. The fact that these individuals were law enforcement officers increases the seriousness of the offenses, as does the fact that he acted against multiple officers.

On the other hand, there is no evidence that the Defendant played a leadership role. There is no evidence that he came to Washington, D.C. planning on engaging in violence. Unlike other rioters, and even some of his co-defendants, he did not come with weapons or tactical gear. Moreover, there is little evidence of the Defendant coordinating with other rioters, before, during, or afterwards. It is true, as the Government argues, that the Defendant jointly undertook the assaults of B.M. and A.W. with other rioters, helping other rioters drag A.W. down the stairs. However, the evidence before me is insufficient to conclude that these circumstances constituted conscious "coordination."

However, I do find very significant that the Defendant remained at the lower west terrace for more than hour, making multiple attempts to enter. His most serious conduct (the assault on B.M. with the baton and the dragging of A.W.) occurred more than hour after his first attempt to push through the officers guarding the entrance and when he first obtained the police baton. In short, to the extent that some of the factors seeming to weigh in his favor are

meant to discern whether the Defendant's offenses were the result of being swept up by impulse, rather than a conscious and deliberate plan, I find that the Defendant had ample opportunity to leave the "war zone" and "battle" he encountered. Instead, he made the conscious decision to remain for more than hour and further engage in that "battle." Thus, having considered all of the factors in addition to overall context of the offenses, I find that the nature and circumstances of the offenses weighs heavily in favor of detention.

2. <u>The weight of the evidence against Defendant.</u>

The weight of the evidence against the Defendant is strong and also weighs in favor of detention. The still-shot images, in combination with the Defendant's statements and the items found at his residence, not only demonstrate the Defendant's presence at the lower west terrace but that the Defendant engaged in the most serious of the offenses with which he is charged. Again, clear and convincing evidence demonstrates that the Defendant did, at the very least, assault B.M. with a baton, with the images on page 15 of GX 1 clearly showing him striking the B.M. as he lay prone on the stairs. His statements also indicate that he felt justified in doing so.

3. <u>Defendant's history, characteristics, and criminal history.</u>

Some of the Defendant's history and characteristics weigh in his favor. He has strong ties to south Florida, having lived here his entire life and having his parents and siblings nearby. His family's presence (in combination with their proffered willingness to co-sign on a bond and his mother's willingness to have the Defendant reside with her) indicate a stability that could mitigate concerns of danger to the community. The Defendant also has somewhat stable employment (although it is difficult to discern how stable a two-year-old audio equipment distribution business is).

However, the Defendant's criminal history, while not replete with serious felonies, is

concerning.  His criminal includes a series of offenses in short succession.  They include multiple instances of disorderly conduct and resisting law enforcement officers.  More importantly, they show multiple instances of the Defendant either violating probation or engaging in violations shortly after a term of probation, including an offense of driving while intoxicated.  I do credit defense counsel's argument that many of these offenses may have been related to abuse of alcohol and are not necessarily similar to the offenses with which he is now charged.  But the alcohol-related offenses and the probation violations suggest that the Defendant has a distinct difficulty with impulse control and decision-making.  Those deficiencies are consistent with the offenses with which he is charged (not just in the decision to go to the Capitol following the rally but also the decision to remain for over an hour in that atmosphere).  Moreover, the commission of offenses while on probation (or even shortly thereafter) suggest an inability to abide by conditions of bond.

As to the Defendant's character, I have considered the letters submitted on his behalf, including their professions that the Defendant has great respect for law enforcement.  However, the Defendant's criminal history and his conduct in this case (per the clear and convincing evidence before me) strongly suggest otherwise.  As stated above, the Defendant had shown resistance to law enforcement multiple times prior to January 6.  Despite his professed respect for law enforcement, he nonetheless branded the MPD officers protecting the Capitol as "traitors" and felt "justified" in assaulting them by the "chaos."[5]  Moreover, I find it significant that the Defendant kept the baton with which he assault B.M.  Whether the Defendant intended to keep it as a trophy or a memento, I cannot determine.  However, the fact that the Defendant kept that weapon over the course of the last year is not emblematic of someone who has remorse or has come to regret

---

[5] Notably, it is the Defendant who chose to stay in the "war zone" atmosphere for more than hour. In other words, the Defendant placed himself – and kept himself – amidst the "chaos" that the officers were trying to quell, not create.

his actions after the passions of the moment have subsided. For all of these reasons, I find that the Defendant's character and history provide significant doubt for whether he would respect and abide by conditions of bond that I could set.

4. <u>The nature and seriousness of the danger to any person or the community that would be posed by Defendant's release.</u>

The unique circumstances of the charged offenses, and the evaluation of the six "Chrestman" factors, also bear on the danger the Defendant may pose if released. *See Sabol*, 2021 WL 1405945 at *10. For similar reasons articulated above, I also find that the Defendant does pose a serious danger to the community if released. It is possible that, removed from the particular passions and circumstances of January 6, without what defense counsel referred to as the "catalyst" of former-President Trump's "war cry" to "walk down to the Capitol. . .[and] show strength" the Defendant would not engage in conduct similar to the crimes charged. However, the clear and convincing evidence is that the Defendant answered that "war cry." Having made that choice, he made the further deliberate choice to remain at the "war zone" for a significant period of time and take up the opportunity (having found a weapon when did not have one previously) to engage in "battle" with law enforcement officers he branded as "traitors." He has a history of conduct that shows a lack of impulse control and an inability to abide by probation conditions. And he retained the baton he used that day for months afterwards, raising a question as to what other "war cries" he might follow in the future.

5. <u>Conclusion</u>

As described above, the nature and seriousness of the offense, the weight of the evidence, and the Defendant's history and characteristics, and the risk posed by the Defendant's release all weigh in favor of granting the Government's motion for pretrial detention. In reaching this conclusion, I have considered conditions proposed by the Defendant, which included a

combination of personal surety and percentage bonds, co-signed by his parents, and home confinement (at his mother's home) enforced through electronic monitoring. However, for the reasons described above, the Defendant's history undermines my faith that even those conditions will be sufficient to assure that the Defendant will not pose a danger to the community. I therefore find that the Government has proven, by clear and convincing evidence, that no conditions or combination of conditions will reasonably assure the safety of the community.

D.   <u>DISPOSITION</u>

Being fully advised, the Court hereby ORDERS that the Defendant, Mason Joel Courson, be detained prior to trial and until the conclusion thereof.

The Court further ORDERS:

1. That the Defendant be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

2. That the Defendant be afforded reasonable opportunity for private consultation with counsel; and

3. That, on order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility in which the defendant is confined deliver the Defendant to a United States marshal for the purpose of an appearance in connection with a court proceeding.

DONE AND ORDERED at Fort Lauderdale, Florida this 23rd day of December 2021.

*Jared Strauss*
Jared M. Strauss
United States Magistrate Judge